## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| PAUL ARCURI<br>820 William Avenue<br>Westminster, Maryland 21157<br><br>ASHLEY KERR<br>443 Oakdale Drive<br>Hartsville, South Carolina 29550<br><br>Plaintiffs,<br><br>v.<br><br>KNORR-BREMSE AG<br>Moosacher Str. 80<br>München, 80809<br>Germany<br><br>KNORR BRAKE COMPANY LLC<br>1 Arthur Peck Drive<br>Westminster, Maryland 21157<br><br>NEW YORK AIR BRAKE LLC<br>748 Starbucks Avenue<br>Watertown, New York 13601<br><br>WESTINGHOUSE AIR BRAKE<br>TECHNOLOGIES CORPORATION<br>1001 Air Brake Avenue<br>Wilmerding, Pennsylvania 15148<br><br>FAIVELEY TRANSPORT NORTH<br>AMERICA, INC.<br>50 Beechtree Boulevard<br>Greenville, South Carolina 29605<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT AND**<br>**JURY DEMAND** |

Plaintiffs Paul Arcuri and Ashley Kerr, on behalf of themselves and all others similarly situated, submit this class action complaint against defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake LLC (together "Knorr"), Westinghouse Air Brake Technologies Corporation ("Wabtec"), and Faiveley Transport North America ("Faiveley," together with Knorr and Wabtec, "Defendants") and allege as follows:

## I.    INTRODUCTION

1.    This is a civil antitrust class action brought by and on behalf of employees of Defendants, the world's largest rail equipment suppliers. Rail equipment employees, like employees in any labor market, benefit when their employers compete for their services. Competition among employers leads to greater negotiating leverage for employees, which in turn leads to higher wages and greater mobility.

2.    Defendants, however, agreed not to compete for the services of rail equipment employees through "no-poach" agreements, meaning Defendants agreed among themselves that they would not solicit or recruit each other's employees. Knorr and Wabtec were the first to enter into a no-poach agreement, which began in January 2009 at the latest. Knorr and Wabtec then each entered into separate no-poach agreements with Faiveley (which has since been acquired by Wabtec). As a result of the agreements, Defendants' employees were denied the benefits of competition and received compensation that was artificially suppressed.

3.    The Department of Justice ("DOJ") uncovered Defendants' no-poach agreements as part of its review of the Wabtec-Faiveley merger. The DOJ made its investigation public on April 3, 2018, when it filed a complaint against Knorr and Wabtec and simultaneously filed a settlement of its claims against the companies. The DOJ stated that its investigation had revealed that Defendants "had for years maintained unlawful agreements not to compete with each other's

employees." According to the DOJ's Competitive Impact Statement, the agreements "suppressed and eliminated competition to the detriment of employees by depriving workers of competitively important information that they could have leveraged to bargain for better job opportunities and terms of employment."

4.     Defendants' anticompetitive conduct is a *per se* violation of sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. Plaintiffs seek overcharge damages stemming from the artificial suppression of their and other employees' wages caused by Defendants' no-poach agreements.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 and 15 U.S.C. sections 1, 3 and 26.

6.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

7.     Venue is proper in this District under 15 U.S.C. section 22 and 28 U.S.C. section 1391 because a substantial part of the acts giving rise to Plaintiffs' claims occurred in this District and the interstate trade and commerce affected by the alleged conduct was and is carried out in part within this District. In addition, Defendant Knorr Brake Company has its headquarters in Westminster, Maryland.

### III.    PARTIES

8.      Plaintiff Paul Arcuri is a resident of Westminster, Maryland. Plaintiff began working for Knorr in September 2012 as an Electronics/Software Engineer. He terminated his employment with Knorr in August 2014. As a result of Defendants' agreements not to compete for each other's employees, Plaintiff was paid less than he would have been absent such agreements.

9.      Plaintiff Ashley Kerr is a resident of Hartsville, South Carolina. Plaintiff began working for New York Air Brake LLC in October 2013 as a Procurement Specialist. She worked as a Material Expeditor from 2013 to 2014, and from 2015 to 2016, she worked as a Machining Buyer. Ms. Kerr terminated her employment with New York Air Brake LLC in July 2016. As a result of Defendants' agreements not to compete for each other's employees, Plaintiff was paid less than she would have been absent such agreements.

10.      Defendant Knorr-Bremse AG is a privately owned German company with its headquarters in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment. In 2017, Knorr had annual sales of approximately $7.7 billion.

11.      Defendant Knorr Brake Company LLC is a Delaware corporation with its headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. Knorr Brake Company manufactures train control, braking, and door equipment used on passenger rail vehicles.

12.      Defendant New York Air Brake LLC is a Delaware company with its headquarters in Watertown, New York, and is a wholly owned subsidiary of Knorr-Bremse AG. It manufactures railway air brakes and other rail equipment used on freight trains.

13.     Defendant Westinghouse Air Brake Technologies Corporation (Wabtec) is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania. Wabtec is a publicly held company, listed on the New York Stock Exchange. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail-equipment industry. Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina.

14.     Defendant Faiveley Transport North America, Inc., formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec acquired Faiveley, which had been a French société anonyme based in Gennevilliers, France. Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley had employees in 24 countries, including at six U.S. locations. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016. In the United States, Faiveley conducted business primarily through Faiveley Transport North America.

## IV.    THE RAIL EQUIPMENT EMPLOYEE MARKET

15.     Worldwide, the railroad equipment manufacturing industry generates about $120 billion in revenue. Knorr and Wabtec (which now includes Faiveley) are the world's largest rail equipment suppliers and are one another's top rival in the development, manufacture, and sale of

equipment used in freight and passenger rail applications. They are among the world's largest employers of rail equipment employees.

16.    As of December 31, 2017, Knorr employed approximately 27,700 employees worldwide.

17.    As of December 31, 2017, Wabtec employed approximately 18,000 full-time employees worldwide with operations in 31 countries. Wabtec acquired approximately 5,700 employees in 24 countries through its acquisition of Faiveley.

18.    Defendants and their subsidiaries compete with one another and with other firms in the rail-equipment industry supply chain to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

19.    The U.S. railroad equipment manufacturing industry is highly concentrated, with the 50 largest companies, including Knorr and Wabtec, accounting for more than 95% of industry revenue. There is high demand for and a limited supply of employees who have rail-equipment industry experience. As a result, firms in the rail equipment industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of competitors are key sources of potential talent to fill these openings.

20.    Firms in the rail equipment industry employ a variety of recruiting techniques, including the use of internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees. Rail companies also receive direct applications from individuals interested in potential employment opportunities. Directly soliciting employees from other rail-

equipment industry participants is a particularly efficient and effective method of competing for qualified employees.

21.     The rail equipment industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy. In addition, firms in the rail equipment industry rely on solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

22.     Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such solicitation, often called "cold calling," is a key competitive tool in a properly functioning labor market. Cold calling may be undertaken by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf. It is a particularly effective recruiting method because current employees of other companies are often unresponsive to other recruiting strategies.

23.     Employees who are not actively seeking to change employers are likely to be more sought-after than unemployed workers or employees actively seeking new employment and, because they are not looking for other jobs, they are difficult to reach without active solicitation. A company searching for a new hire can save costs and avoid risks by poaching that employee from a rival company.

24.     Through poaching, a company is able to take advantage of its rival's efforts soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was

truly acting in its independent self-interest, it would solicit the other's employees, including through offers of increased employment benefits and pay.

25.    The practice of cold calling significantly impacts employee compensation in several respects. First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases. When a current employee receives a cold call from a rival company with an offer that exceeds his or her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer. In either scenario, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.

26.    Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer. The other employees in turn may use the information themselves to negotiate pay increases or move from one employer to another. And because there is pressure to match or exceed the highest compensation package offered by a rival employer, the cold caller and the rival's employee will discuss the employee's current compensation, further increasing the flow of compensation information. Increased information and transparency regarding compensation levels tends to increase compensation across all current employees.

27.    Third, when a company expects that its employees will be cold called by rivals with employment offers, the company may preemptively increase its employees' compensation to reduce the risk that its rivals will be able to poach otherwise undercompensated employees.

28.    The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried employees of the participating companies.

29.    In a properly functioning and lawfully competitive labor market, each Defendant would compete for employees by soliciting current employees of one or more of the other Defendants through cold calling. Defendants would use cold calling as one of their most important tools for recruiting and retaining employees. The use of cold calling among Defendants would impact and increase total compensation and mobility of all Defendants' employees.

## V.    DEFENDANTS' NO-POACH AGREEMENTS

30.    Beginning as early as 2009, Knorr and Wabtec entered into a series of no-poach agreements not to solicit, recruit, or otherwise compete for employees. In addition, Knorr and Wabtec separately entered into no-poach agreements with Faiveley, before Faiveley was acquired by Wabtec in November 2016. As part of their agreements, Defendants agreed not to inform each other's employees of available positions unless that individual employee had applied for a job opening on his or her own initiative.

31.    Defendants further agreed to notify each other when an employee of one Defendant applied for a position with another Defendant. In these circumstances, when an employee at one Defendant contacted a second Defendant, the second Defendant would typically (a) notify the first Defendant and (b) forebear considering the applicant without permission of the other Defendant.

32.　　Defendants also exchanged competitively sensitive information about employee compensation. The agreements and information exchanges were carried out and enforced by senior company executives and implemented throughout Defendants' U.S. subsidiaries.

**A.　　The Wabtec-Knorr Agreement.**

33.　　Wabtec and Knorr entered into no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire each other's employees. The no-poach agreements between Wabtec and Knorr primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting the other company's current employees.

34.　　Beginning no later than 2009, Wabtec's and Knorr Brake Company's most senior executives entered into an express no-poach agreement and actively managed that agreement through direct communications. In a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'" Senior executives at the parent companies, including top Knorr executives in Germany, who were included in key communications about the no-poach agreement had knowledge of the agreement. In furtherance of their agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from the other company.

35.　　In some instances, Wabtec and Knorr Brake Company's no-poach agreement foreclosed consideration of an unsolicited applicant employed by Wabtec or Knorr Brake

Company without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr Brake Company stated that he would not even consider a Wabtec candidate who applied to Knorr Brake Company without the permission of his counterpart at Wabtec. And in July 2012 a senior executive at New York Air Brake Corporation informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

36.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a Knorr Brake Company employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**B.     The Knorr-Faiveley Agreement.**

37.     Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America reached an express no-poach agreement. The agreement included promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at Knorr Brake Company explained in an e-mail to a high-level executive at Knorr-Bremse AG that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr

11

Brake Company and Faiveley's U.S. subsidiary actively managed the agreement through direct communications with each other.

38.     During a trade show in Berlin, Germany in or about 2012, a senior executive at Knorr Brake Company discussed with an executive at Faiveley Transport North America the companies' no-poach agreement. The executives then enforced the no-poach agreement through direct communications with each other. Senior executives at the companies had knowledge of the no-poach agreement and directly communicated with each other to ensure adherence to the agreement. For example, in October 2012, executives at Faiveley Transport North America stated in an internal communication that they were required to contact Knorr Brake Company before hiring a U.S. train brake engineer.

**C.     The Wabtec-Faiveley Agreement.**

39.     Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

40.     Wabtec Passenger Transit and Faiveley Transport North America executives actively managed and enforced their agreement with each other through direct communications. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley Transport North America without first getting permission from Faiveley Transport North America executives. In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]." Only after receiving permission from Faiveley Transport North America did Wabtec Passenger

Transit hire the project manager. One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the agreement with Faiveley Transport North America not to engage in hiring discussions with each other's employees without the other's prior approval.

41.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Faiveley is presently a wholly-owned subsidiary of Wabtec.

**D.    The Investigation by the Antitrust Division of the United States Department of Justice.**

42.    For many years the DOJ has been investigating the use of no-poach agreements in a variety of industries. The DOJ has brought civil actions against some of the largest companies in the United States—including Adobe, Apple, Ebay, Google, Intel, Intuit, and Lucasfilm—for entering into no-poach agreements.

43.    In October 2016 the DOJ announced that from that point forward it intended to criminally investigate no-poaching and wage-fixing agreements. The agency explained that "[t]hese types of agreements eliminate competition in the same irredeemable way as agreements to fix the prices of goods or allocate customers." In connection with that announcement, the DOJ and the Federal Trade Commission jointly issued an Antitrust Guidance for Human Resource Professionals.[1] The guidance reiterated that the DOJ would "proceed criminally against naked wage-fixing or no-poaching agreements" and that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."

---

[1] *Available at* https://www.justice.gov/atr/file/903511/download.

44.    In July 2015, Wabtec announced its intent to acquire Faiveley. The DOJ conducted a review of the transaction to ensure that the merger would not unduly limit competition. In connection with that review, the DOJ obtained and reviewed documents and materials provided by the companies. The DOJ's investigation of the Wabtec-Faiveley merger uncovered the companies' no-poach agreements, which then resulted in the launch of a separate investigation, pursuant to which the DOJ found the companies had entered into the no-poach agreement alleged herein.

45.    On April 3, 2018, following its investigation, the DOJ filed a complaint in federal court against Knorr and Wabtec and simultaneously filed a settlement with the two companies. The DOJ's complaint alleged that Knorr and Wabtec, "[o]ver a period spanning several years . . . entered into similar no-poach agreements with one another to eliminate competition between them for employees." The head of the Antitrust Division of the DOJ, Assistant Attorney General Makan Delrahim, stated that "[t]he unlawful agreements . . . restrained competition for employees and deprived rail industry workers of important opportunities, information, and the ability to obtain better terms of employment." He explained that the complaint was "part of a broader investigation by the Antitrust Division into naked agreements not to compete for employees—generally referred to as no-poach agreements."

46.    The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

47.    Under the terms of the settlement, Wabtec and Knorr are prohibited from entering, maintaining, or enforcing no-poach agreements with any other companies going

forward. The proposed stipulation and order by the DOJ covers both parent companies Wabtec

and Knorr, and their successors and assigns, subsidiaries (including Faiveley Transport),

divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents,

and employees.

48.     In its filings, the DOJ emphasized that the settlement agreement with Defendants

covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for

various employees, including "project managers, engineers, executives, business unit heads, and

corporate officers." The DOJ's Competitive Impact Statement stated that the agreements

"suppressed and eliminated competition to the detriment of employees by depriving workers of

competitively important information that they could have leveraged to bargain for better job

opportunities and terms of employment."

## VI.    EFFECTS ON COMPETITION AND ANTITRUST IMPACT

49.     Defendants restricted competition in the labor market by agreeing not solicit each

other's employees and to limit compensation for their employees. Defendants' conduct had the

purpose and effect of artificially suppressing and lowering the compensation paid to Plaintiffs.

50.     In a competitive labor market, employers compete with one another to attract

employees. Competition in the labor market benefits employees because it increases the

available job opportunities that employees learn about. It also improves an employee's ability to

negotiate for a better salary and other terms of employment. As the DOJ explained in its 2016

announcement "[c]ompetition is essential to well-functioning markets, and job markets are no

exception." The agency's 2016 Antitrust Guidance for Human Resource Professionals further

explains that "competition among employers helps actual and potential employees through

higher wages, better benefits, or other terms of employment."

51.     Cold-calling and other forms of solicitation create competition in the employment marketplace. That increased competition results in increased compensation for employees. Cold calls from competing employers may include offers that exceed an employee's current salary, which the employee can accept or use to increase his or her salary with his or her current employer.

52.     In addition, an employer that is not precluded from soliciting its competitors' employees through a no-poach agreement will offer higher compensation than the employee currently receives to make its solicitations effective. That incentive to offer competitive compensation disappears when, as here, he employer is prohibited from soliciting employees from its competitors. And absent the threat of its employees being solicited by, and receiving higher salary offers from, its competitors, that same employer has little incentive to raise its own employees' compensation.

53.     In short, competition between employers for employees will necessarily lead to increases in employee compensation. But when employers agree not to actively compete for employees, as Defendants did here, the lack of competition will slow or eliminate the need to offer higher salaries to their own employees or their competitors' employees.

54.     The effects on compensation of cold-calling, recruitment, and other solicitations extends beyond the employees that would have, absent Defendants' no-poach agreements, been the target of recruitment or other solicitation. Compensation negotiations generally occur from a starting point of the pre-existing baseline compensation level in the industry for similar positions. The eventual compensation any particular employee receives is either entirely determined by the baseline level or is significantly influenced by it. In either case, suppression of baseline compensation will result in suppression of total compensation.

55.     Increased compensation for individual employees creates a new baseline that will result in compensation increases for other, similarly situated employees. And when one employee is provided information about higher salaries disseminated by direct solicitation or through recruitment, that information is likely to spread to other employees and increase the baseline. But when, as here, a no-poach agreement restricts the flow of compensation information, baseline compensation throughout the industry becomes less transparent and employees lack the information necessary to demand or negotiate competitive salaries. Defendants' conduct therefore not only impacted those employees who would have been the target of cold-calling, recruitment, or other solicitation but for Defendants' agreement, it also commonly impacted all Class members employed by Defendants.

## VII.    FRAUDULENT CONCEALMENT

56.     Plaintiffs had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until the DOJ's settlement with Defendants became public on April 3, 2018. At no point did Defendants inform Plaintiffs that their compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiffs therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy.

57.     Defendants publicly described themselves as competitors. Wabtec's 2017 Form 10-K listed Knorr as a "principal competitor." Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." And in the related commercial vehicle market, Knorr identified WABCO (a trade name of Wabtec) as "its principal competitor." These statements indicated to the public that Defendants were competing, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

58.     Wabtec's 2017 10-K also stated that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates." Knorr's Code of Conduct similarly states that the company expected "the entire workforce not only to observe internal regulations but also observe the law[.]" These statements indicated that Defendants were acting lawfully, not engaging in a long-running anticompetitive conspiracy to suppress the compensation of their employees.

59.     Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden, Defendants' discussions in furtherance of the conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters. Defendants relied on non-public forms of communication to effectuate their conspiracy and to avoid disclosure of the conspiracy beyond the individuals involved.

60.     Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiffs. While the DOJ has been investigating non-solicitation agreements since at least 2010—and has taken action against companies like Adobe, Apple, Ebay, Google, and Intel—the DOJ only became aware of Defendants' conspiracy during its merger review of Wabtec's 2016 acquisition of Faiveley. Plaintiffs were not a part of the merger review and did not have access to the documents provided to the DOJ as part of that review.

61.     Plaintiffs therefore had no reason to know, or even suspect, that Defendants were conspiring to artificially suppress their employment compensation until the DOJ's public announcement on April 3, 2018.

62.     As a result, the running of any applicable statute of limitations has been tolled with respect to Plaintiffs' claims concerning Defendants' conspiracy.

## VIII.   INTERSTATE COMMERCE

63.     During the Class Period, Defendants employed Plaintiffs and other Class members in at least California, Delaware, Maryland, New York, Pennsylvania, South Carolina, and Texas. Defendants' other subsidiaries employed workers in at least California, Illinois, Kentucky, Ohio, Virginia, and Wisconsin.

64.     States compete to attract rail-equipment industry offices, leading employment in the industry to cross state lines.

65.     Labor competition in the rail and freight industry is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location, and many Class members moved between states to pursue opportunities.

66.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust industry throughout the United States.

## IX.   CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action on behalf of themselves, and under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a class (the "Class") seeking damages and other relief defined as:

> All natural persons employed by Defendants or their wholly owned subsidiaries at any time from 2009 to the present. Excluded from the class are senior executives and personnel in the human resources and recruiting departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

68.    Members of the Class are so numerous that joinder is impracticable. The Class includes hundreds, if not thousands, of members as each Defendant employed hundreds or thousands of Class members each year.

69.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, Defendants' agreement denied them the benefits of competition in their employment and received lower wages as a result.

70.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. Their interests are aligned with, and not antagonistic to, those of the Class. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

71.    Questions of law and fact common to the Class include:

- Whether Defendants agreed not to solicit each other's employees;

- Whether Defendants conspired to and did suppress competition in the market for rail equipment employees;

- Whether Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

- Whether Defendants' challenged conduct harmed competition in the rail equipment employment market;

- Whether Plaintiffs suffered injury as a result of Defendants' conduct;

- The amount of damages to Plaintiffs that resulted from Defendants' conduct; and

- Whether Defendants fraudulently concealed their conduct.

72.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class.

73.     Class treatment is a superior method for the fair and efficient adjudication of the controversy, because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

74.     Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

75.     Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## X.    CLAIMS FOR RELIEF

### Violation of Sections One and Three of the Sherman Act

76.     Plaintiffs incorporate by reference the allegations set forth above as though fully set forth herein.

77.     Beginning as early as 2009, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants entered into an agreement, combination, and conspiracy to unreasonably restrain trade in violation of sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Defendants have agreed, combined, and conspired to restrict

competition in the rail equipment employment market by refraining from soliciting each other's rail equipment employees.

78.      Defendants' conduct deprived Plaintiffs of the benefits of competition and artificially suppressed their compensation.

79.      Defendants' anticompetitive and unlawful conduct is a horizontal agreement among would-be competitors that is *per se* illegal under the Sherman Act.

80.      As a direct and proximate cause of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Plaintiffs and Class members have and will continue to receive compensation that is less than they would have received had the market for their services been competitive.

## XI.     PRAYER FOR RELIEF

81.      WHEREFORE Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

A.  Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), and declare Plaintiffs as the representatives of the Class, and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

B.  Determine that the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act and (b) a *per se* violation of Sections 1 and 3 of the Sherman Act;

C.  Enter joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

D. Enter injunctive relief against Defendants to prevent and restrain their violations of Sections 1 and 3 of the Sherman Act;

E. Award damages to the Class in an amount to be determined at trial and treble damages;

F. Award Plaintiffs and the Class pre- and post-judgment interest as provided by law, awarding such interest at the highest legal rate;

G. Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H. Award Plaintiffs and the Class such other and further relief as the case may require and the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

82.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated:  April 23, 2018                   Respectfully submitted,


By:  */s/  James P. Ulwick*
    James P. Ulwick (Bar No. 00536)
    **KRAMON & GRAHAM P.A.**
    One South Street, Suite 2600
    Baltimore, MD 21202
    Tel: (410) 752-6030
    Fax: (410) 539-1269
    julwick@kg-law.com

    Andrew C. White (Bar No. 08821)
    William N. Sinclair (Bar. No. 28833)
    Stephen G. Grygiel (Bar No. 09169)
    **SILVERMAN THOMPSON SLUTKIN WHITE, LLC**
    201 N. Charles Street, 26th Floor
    Baltimore, MD 21201
    Tel: 410-385-2225
    Fax: 410-547-2432
    awhite@mdattorney.com
    bsinclair@mdattorney.com
    sgrygiel@mdattorney.com


    Daniel C. Girard (*pro hac forthcoming*)
    Dena C. Sharp (*pro hac forthcoming*)
    Adam E. Polk (*pro hac forthcoming*)
    Scott Grzenczyk (*pro hac forthcoming*)
    **GIRARD GIBBS LLP**
    601 California Street, 14th Floor
    San Francisco, CA 94108
    Tel: 415-981-4800
    Fax: 415-981-4846
    dcg@girardgibbs.com
    chc@girardgibbs.com
    aep@girardgibbs.com
    smg@girardgibbs.com


    *Counsel for Plaintiffs Paul Arcuri, Ashely Kerr, and the proposed Class*